01

02

03

04
                        UNITED STATES DISTRICT COURT
05              FOR THE EASTERN DISTRICT OF CALIFORNIA

06  RICARDO HERNANDEZ,                    )
                                          )
07          Petitioner,                   )       CASE NO. 2:07-cv-00839-RSL-JLW
                                          )
08          v.                            )
                                          )
09  R.J. SUBIA, Warden,                   )       REPORT AND RECOMMENDATION
                                          )
10          Respondent.                   )
    _____)
11

12          I.      SUMMARY

13          Petitioner Ricardo Hernandez is currently incarcerated at the Mule Creek State Prison

14  in Ione, California.  Upon his conviction in 1985 of two counts of second degree murder, and

15  assault with a deadly weapon, he was sentenced to a term of fifteen-years-to-life, with

16  possibility of parole, and a concurrent term of six years on the assault charge.

17          In 2005, the Board of Parole Hearings of the State of California (the "Board")[1]

18  granted his application for release on parole.  But Governor Arnold Schwarzenegger reversed

19  that decision, and denied parole.  The same sequence was repeated in 2006: a new hearing, a

20  new grant by the Board, but again a reversal by the Governor.  Having exhausted his remedies

21  in the courts of California, petitioner seeks federal habeas corpus relief, under 28 U.S.C.

22  _____
            [1] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1,
    2005.  *See* California Penal Code § 5075(a).

    REPORT AND RECOMMENDATION - 1

01 § 2254.

02       Petitioner had been in custody for almost twenty years at the time of his 2005 hearing

03 – and over twenty-four years as of this writing.

04       The Court, having thoroughly reviewed the record and briefing of the parties, finds

05 that petitioner is entitled to the relief requested, and recommends the Court grant the petition.

06       II.     FACTUAL BACKGROUND[2]

07       In January 1985, the date of the assault offense, petitioner was twenty-one years of

08 age, and lived with his large family in Compton, California.  He was associated with a gang,

09 the "Tortilla Flats."  Before his 1985 offenses, he had a prior conviction for spray-painting a

10 wall with graffiti, and a misdemeanor conviction for possession of a controlled substance.

11       On January 11, 1985, petitioner and two co-defendants, both of whom were minors,

12 confronted Pedro Gil at his residence about a prior incident in which Gil nearly ran over

13 petitioner with a car.  (*See* Docket 6, Exhibit 3 at 9.)  After petitioner allegedly threatened Gil,

14 one of the minors shot Gil in the chest and injured him.  (*See id*.)  Petitioner later pled guilty

15 to assault with a deadly weapon for his role in this offense.

16       Petitioner's murder convictions arose from a gang-related shooting that took place on

17 June 16, 1985, about five months later.  (*See id*. at 10.)  Members of a rival street gang, "the

18 Rebels," drove into petitioner's neighborhood to "settle" a dispute between the two gangs

19 which had taken place earlier that day.  (*See id*.)  A fight broke out when members of the

20 "Rebels" began throwing bottles and other objects at "Tortilla Flats" gang members.  (*See id*.)

21 _____

22     [2]The record before this Court includes transcripts of both hearings before the Board.  The factual
evidence at those two hearings is consistent in all relevant respects, except that the second hearing contains
additional evidence as to his employment plans.  The transcripts of both hearings were available to the Governor
when he denied parole in 2006.  This factual summary draws upon facts set forth in both transcripts.

REPORT AND RECOMMENDATION - 2

01   After several members of the "Rebels" tried to scale a fence in order to harm petitioner, who

02   was on the other side, petitioner retrieved a rifle from one of his friends and began firing.

03   According to petitioner, he missed the persons climbing the fence, but hit two other members

04   of the Rebels who were sitting in the back of a pick-up truck.  (*Id*.)  Petitioner's shooting

05   resulted in the deaths of Andrews Ortega and David Flores.  (*See id*. at 10-11.)

06        Petitioner pled guilty to two counts of second degree murder with the use of a deadly

07   weapon, and one count of assault with a deadly weapon in Los Angeles County Superior

08   Court on December 12, 1985.  (*See id*., Ex. 6 at 1.)  He received two concurrent terms of

09   fifteen-years-to-life with the possibility of parole for the murder charges, and a six-year term

10   for the assault charge to run concurrently with his life sentence.  (*See id*.)  His minimum

11   eligible parole date was set for June 24, 1995.  (*See id*., Ex. 3 at 1.)

12        At his parole hearings, petitioner volunteered the fact that he had also been involved in

13   two drive-by shootings during approximately the same period as the offenses for which he

14   was convicted.  He was never charged for this conduct, and does not know whether there were

15   any resulting injuries.  (*See id*., Ex. 2 at 16-17.)

16        During his first several years in prison, petitioner continued his gang affiliation.  In

17   1986, an inmate was stabbed on the weight pile at San Quentin.  Petitioner was charged as the

18   assailant and given 15 months in the Security Housing Unit ("SHU"), but he steadfastly

19   denies any involvement in the stabbing.  (*See id*., Ex. 3 at 69-70.)  On a different occasion,

20   petitioner was charged with using force and violence in the yard, but that was later reduced to

21   a less serious infraction.  When petitioner was at Chino in 1987, he was disciplined for

22   possession of a double-edged razor blade.  He explained, "I was told through gang traditions

REPORT AND RECOMMENDATION - 3

01  that you always have to arm yourself, because you're going to be challenged and you have to

02  meet the challenge … I think the razor blade was found in the cell.  It was used for cutting

03  cardboard, but it is dangerous contraband and I took responsibility for it."  (*See id.* at 70-71.)

04  He was also disciplined for possession of marijuana, and for possession of an inmate-made

05  metal weapon.  All of this occurred during his first four years in prison.

06       In 1989, however, petitioner made an abrupt, positive change in his behavior.  At the

07  2006 hearing, the Presiding Commissioner of the Board asked:

08       PRESIDING COMMISSIONER GARNER:  What happened in
         1989 that turned you around? You had a lot of trouble, it seems,
09       adjusting.  Was there any one event or revelation that came to
         you that got you turned around?

10
11       INMATE HERNANDEZ: Yes, it did.  Having my mother come
         see me in San Quentin in the SHU, behind a granite wall and
12       through a small window and seeing me in shackles, and seeing
         the tears fall from her eyes.  That day told me that I need to
13       change, because everything that I was doing on the streets I was
         still doing in prison, and seeing her and the sadness in her eyes
         led me to the (indiscernible) where I am today.

14

15  (*Id.* at 64-65.)

16       Most significantly, petitioner terminated his gang affiliations.  In 1992 he was ordered

17  by members of the "Mexican Mafia" to stab another individual within the prison.  Petitioner

18  told the Board that he had no affiliation with the Mexican Mafia.  But, "[o]nce you're in a

19  SHU in any prison, the Mexican Mafia runs the SHU.  In order for you to stay out of the SHU

20  you have to play by the rules, and I was done after seeing my mom, following those rules.  So

21  I refused to do it."  (*See id.* at 72-73.)  As a result of his refusal, petitioner himself was

22  stabbed in 1992.

REPORT AND RECOMMENDATION - 4

01      Commenting on these two events, the Board observed that "[e]ither of those could be a

02  life altering [event] for [petitioner] and whichever one it was, [it] worked." (*Id*. at 114.)

03      The record of progress and achievement by petitioner since 1989 fully bears out that

04  observation.  He had no significant disciplinary problems starting in 1989, and continuing for

05  at least seventeen years through the 2006 parole hearing.  But above and beyond the lack of

06  trouble, he has compiled an exemplary, positive record of achievement.

07      Petitioner has been involved in a wide variety of "self-help and therapy programming"

08  within the institution.  The most significant, for him, has been his extensive involvement with

09  the 12-step Criminal Gangs Anonymous ("CGA") program.  (*See id*. at 45 and 112.)

10  Specifically, petitioner has served as a facilitator in the CGA program, and he personally

11  developed the CGA Spanish program in 2003.  (*See id*. at 55-56.)   During the 2005 hearing

12  he told the Board that, through the CGA program, he developed insight into why he became

13  involved in gang activity:

14          I was always a chubby kid and as a little kid – I still am.  I'm a
chubby man now, but back then the bullying I received at

15          school and as a little kid, it hurt me.  And I got to a certain age
that I got tired of all the bullying and the laughter.  And people

16          used to look at me, I felt, that [sic] looked at me with disgust
and I wanted to change that.  I tried sports and that didn't help.

17          My family has always been loving to me, you know, and I've
always known that, but it wasn't enough.  And it wasn't until I

18          joined that gang that it got me what I felt that I needed, the
acceptance.  You know, people didn't look at me as a fat kid no

19          more.  And it wasn't because all the sudden [sic] they loved me,
because I became a very violent gang member.   And that

20          brought me the acceptance and once I got it, I couldn't stop
doing it … See, at that time, I felt that if I didn't do it … that I

21          would lose everything that I had gained, the status.

22  (*Id*., Ex. 2 at 30-31.)

REPORT AND RECOMMENDATION - 5

01      The CGA program also provided him insight regarding the commitment offense:

02          PRESIDING COMMISSIONER GARNER: When did you first
            come to grips with the commitment offense and have – start
03          having feelings of remorse for what you'd done?

04          INMATE HERNANDEZ: I removed all those defects in
            character that didn't allow me to see the enormity of what I did.
05          Because I've always felt justified. A gang member was justified
            because the other guys were gang members.  And when I didn't
06          [sic] remove those defects of character within me and took full
            responsibility, that's when I saw the enormity of what I had
07          done.  I had no shields to see that through, to guide me from
            that.  I seen beyond those two persons being gang members, and
08          I seen them as David and Andres, with families just like I had.
            Before I didn't allow myself to see that.  It helped me to
09          withstand all the time that I been in prison.  Once I removed all
            those defects in character, I saw how I impacted their families.

10

11  (*Id*., Ex. 3 at 65-66.)

12      Petitioner made these comments regarding the commitment offense at his second

13  hearing.  But they were an echo of his statements at the first hearing: "[w]hen it happened, my

14  beliefs were that I was defending not only myself, but my neighborhood, the reputation of our

15  neighborhood.  Back then, I thought that I was doing the right thing.  And back then, I saw the

16  gang members as gang members.  And throughout the years, as far as becoming a mature

17  adult and through recovery, I've learned that they were human beings."  (*See id*., Ex. 2 at 22.)

18      Among other activities, petitioner has "worked with the [Enhanced Outpatient

19  Program] organizing sports and talent shows," completed a 60-day workshop on the Benefits

20  of Self-Honesty and Truthfulness with Others, participated in Alcoholics Anonymous ("AA")

21  and Narcotics Anonymous ("NA"), and written book reports describing the lessons he learned

22  by reading self-help books during his free-time in prison.  (*See id*., Ex. 3 at 44-45, 50-53, and

REPORT AND RECOMMENDATION - 6

01 | 112.)

02 |      The Board also found that petitioner's institutional activities indicate an enhanced

03 | ability to function within the law upon release.  *See* 15 CCR § 2402(d)(9).  For example,

04 | petitioner has "what's perceived to be one of the more prestigious jobs that an inmate can get,

05 | and that's working as a Clerk.  [He has] received excellent work reports…."  (Dkt. 6, Ex. 3 at

06 | 111.)  His vocational accomplishments include completion of the Vocational Electronics

07 | Program in 2003, as well as the Furniture Refinishing Program in 1995.  (*See id*. at 43.)

08 | Petitioner also improved himself educationally by earning his GED in 1989.   (*See id*. at 112.)

09 |      Petitioner's "maturation, growth, and … greater understanding," as well as his signs of

10 | remorse, were also cited by the Board as factors indicating petitioner's suitability for parole.

11 | (*See id*. at 113-114.)  *See* 15 CCR § 2402(d)(3) and (7).  The Board observed that petitioner is

12 | "older, [although he is certainly not] an advanced age.  [He has] got a lot of time left to make

13 | good.  [He has] got a very reduced probability of recidivism."  (Dkt. 6, Ex. 3 at 113.)  It also

14 | noted that his actions indicate the presence of "remorse, and [that he] understand[s] the nature

15 | and the magnitude of the offense, and [he] accept[s] … responsibility for [his] behavior, and

16 | [his] desire to change toward good citizenship."  (*Id*. at 114.)

17 |      The Governor acknowledged petitioner's participation in "self-help and therapy,

18 | including Alcoholics Anonymous and Narcotics Anonymous, Special Recovery, Honesty &

19 | Truthfulness, Grief Ministry Group, Amer-i-can program, and Criminal & Gang Members

20 | Anonymous.  He has earned numerous laudatory chronos, and has received favorable reports,

21 | inclusive of some low risk assessments, from correctional and mental-health professionals."

22 | (*Id*., Ex. 5 at 2.)  Furthermore, the Governor noted petitioner's ability to maintain close

REPORT AND RECOMMENDATION - 7

01    relationships with others, as well as his "confirmed plans to reside [in Mexico] with a family

02    friend [and] work at a friend's hardware store" upon his release.  (*Id*.)  The Board's 2006

03    decision noted that petitioner has experienced reasonably stable relationships with others,

04    because he managed to maintain "extremely close family ties" with his "very large" and "very

05    successfully family" throughout his incarceration.  (*See id.,* Ex. 3 at 113.)  *See* 15 CCR

06    § 2402(d)(2).  The Board observed that petitioner's family has expressed "their willingness to

07    help [petitioner] spiritually, financially, [with] pretty much anything [he] need[s].  Not many

08    people are blessed with that, and [petitioner is] lucky to have it."  (Dkt. 6, Ex. 3 at 113.)

09           Petitioner's 2004 psychological evaluation assessed his "violence potential in the free

10    community" as "minimal," and asserted that petitioner will "use [his] insight and leadership

11    skills in a pro-social way" upon his release from prison.  (*Id*. at 114-15.)  His 2001

12    psychological evaluation also asserted that if petitioner is released into the free community, he

13    will "maintain [his] current non-violent character … what appears to be an excellent ability to

14    get along with others, and a genuine willingness to work directly and honestly with the

15    problems."  (*Id*. at 57-62 and 115.)

16           The applicable regulations require the Board to consider a prisoner's "understanding

17    and plans for the future," including a prisoner's "realistic plans for release or … marketable

18    skills that can be put to use upon release" as a factor tending to indicate suitability for parole.

19    *See* 15 CCR § 2402(d)(8).  Petitioner is a Mexican national; and while he alleges his presence

20    in this country has been legal, he acknowledges it is very likely he will be deported or

21    removed to Mexico if he is released on parole.  Accordingly, at both Board hearings,

22    petitioner and his counsel presented evidence as to how, where, and by whom he would be

01 employed upon his return to Mexico.

02       In reviewing the 2005 Board decision, the Governor found petitioner had not shown

03 his employment plans were "viable or realistic." (Dkt. 6, Ex. 4 at 2.) During the 2006 parole

04 hearing, however, petitioner provided the Board with detailed documentation of his

05 employment plans in Mexico. (*See id*., Ex. 3 at 26-39.) As a result, the Governor's 2006

06 decision noted that "[a]s a Mexican national subject to deportation upon release, [petitioner]

07 has made confirmed plans to reside there with a family friend, and plans to work at a friend's

08 hardware store. He also has made alternate plans, in case he is paroled to California…." (*See*

09 *id*., Ex. 5 at 2.) The Governor then concluded that petitioner's parole plans constituted a

10 factor "supportive of Mr. Hernandez's release from prison." (*Id.*) Thus, there were some

11 defects in petitioner's 2005 parole plans, although these defects may not have been fatal.

12 Regardless, these defects were cured in 2006. For purposes of this court's review, there

13 remains no issue as to whether petitioner has shown acceptable employment plans.

14       III.     DECISIONS BY THE BOARD; REVERSALS BY THE GOVERNOR

15       Petitioner's sixth and seventh overall parole consideration hearings were held on

16 January 21, 2005, and January 19, 2006, respectively. (*See id*., Exs. 2 and 3.) At both

17 hearings, the Board concluded that petitioner was suitable for parole and would not pose an

18 unreasonable risk of danger to society or threat to public safety if released from prison. (*See*

19 *id*., Ex. 2 at 90; *id*., Ex. 3 at 111.) The Board in 2005 characterized it as a "tough decision"

20 because of the seriousness of gang violence, and public concerns about it. But the Board

21 concluded, "it appears that you have made significant turnarounds and we feel that, listening

22 to your testimony and reading your files, it sounds that you're genuinely repentant. Not only

01 that, it appears that you have tried to make some amends for what you did and you're trying to

02 become productive.  And the bottom line is, a good citizen.  While imprisoned, we feel that

03 you've enhanced your ability to function within the law upon release by participating in

04 educational programs."  (*Id*., Ex. 2 at 90-91.)  The Presiding Commissioner added, "We also

05 looked at maturation.  Because of maturation, growth, greater understanding and advanced

06 age, we feel that that [sic] have reduced your probability of recidivism.  We do feel that you

07 have realistic parole plans, which include a job offer.  However, we are going to make it a

08 special condition of parole that you not reside in Compton, California … We are going to

09 approve your parole plans for Mexico."  (*Id*. at 93-94.)

10        The Board's 2005 decision became final on May 21, 2005.  (*See id*. at 105.)

11 The Governor, however, exercised his authority pursuant to Article V, Section 8, Subdivision

12 (b) of the California Constitution to reverse the Board's decision.  (*See id*., Ex. 4.)  *See also*

13 Cal. Penal Code § 3041.2.  The Governor relied primarily upon the facts of the commitment

14 offense, but also cited petitioner's prior criminal history, his disciplinary record in prison, and

15 the Los Angeles District Attorney's opposition to parole.  (*See* Dkt. 6, Ex. 4 at 1-3.)  He also

16 asserted that petitioner's parole plans were insufficient, because the record did not indicate

17 whether petitioner's employment plans if deported and paroled to Mexico were "viable or

18 even realistic at this time."  (*Id*. at 2.)  The factors discussed in the Governor's decision are

19 among those listed as unsuitability and suitability factors in § 2402(b), (c) and (d) of title 15

20 of the California Code of Regulations.  The Governor concluded that evidence of petitioner's

21 progress in prison did not outweigh evidence of his unsuitability for parole.  (*See* Dkt. 6, Ex. 4

22 at 3.)

REPORT AND RECOMMENDATION - 10

01          The procedural history in 2006 was very similar.  After a new hearing, conducted on

02   January 19, 2006, the new Board reached the same conclusion: "you're suitable for parole and

03   you wouldn't pose an unreasonable risk of danger to society or a threat to public safety if

04   you're released from prison." (*Id.*, Ex. 3 at 111.)  The Board cited many of the positive things

05   petitioner had done while in prison, and the laudatory letters the Board had received in his

06   support.  They found his employment and housing plans in Mexico were "intact." (*See id.* at

07   112.)  Relying in part upon the positive psychological reports, the Board found, "You've got a

08   very reduced probability of recidivism." (*Id.*)

09          The Board's 2006 decision became final on May 19, 2006. (*Id.* at 119.)  But less than

10   thirty days later, the Governor again reversed. (*See id.*, Ex. 5.)  Although the Governor noted

11   petitioner's positive achievements while in prison, he reversed the grant of parole for reasons

12   which were basically the same as in the 2005 reversal, except that the Governor noted with

13   approval petitioner's plans for employment in Mexico. (*See id.* at 1-3.)

14          At the time of the Governor's 2006 reversal, petitioner was forty-two-years-old, and

15   had been in custody approximately twenty-one years. (*See id.*, Ex. 3 at 11.)

16          IV.      EXHAUSTION OF STATE COURT REMEDIES

17          Following the Governor's reversal of the Board's 2005 parole grant, petitioner filed a

18   habeas corpus petition in the Los Angeles County Superior Court. (*See id.*, Ex. 7.)  On June

19   9, 2006, while petitioner's superior court petition was still pending, the Governor also

20   reversed the Board's 2006 parole grant. (*See id.*, Ex. 5; *id.*, Ex. 7 at 1.)  Petitioner then

21   amended his superior court petition to include both the Governor's 2005 and 2006 parole

22   denials. (*See id.*, Ex. 7.)  Although the superior court expressly considered the habeas petition

01 "filed on December 27, 2005, as amended on July 7, 2006," its order provided, "This order is

02 limited to petitioner's challenge to the Governor's decision dated May 31, 2005," and denied

03 the request for habeas relief.  (*Id.* at 1.)

04      Petitioner filed habeas petitions in the California Court of Appeal and California

05 Supreme Court challenging the Governor's 2005 and 2006 parole reversals, but both petitions

06 were summarily denied.  (*See id.*, Exs. 8 and 9.)  This federal habeas petition followed.

07 Respondent admits that petitioner's habeas petition was timely, and petitioner properly

08 exhausted each of his claims before the California Supreme Court.  (*See* Dkt. 6 at 4.)

09     V.      PARTIES' CONTENTIONS

10      Petitioner contends that the Governor violated his state and federal due process rights

11 by finding him unsuitable for parole in 2005 and 2006 without any evidence that he poses an

12 unreasonable risk of danger to society if released from prison.[3]  (*See* Dkt. 1 at 5.)

13 Specifically, petitioner claims the Governor erred by finding him unsuitable based upon

14 immutable factors that "will never change," such as his commitment offense and prior

15 criminal conduct, without establishing "a rational nexus" between those immutable factors

16 and a finding of current dangerousness as required by California law.  (*See id.* at 4.)  In

17 addition, petitioner argues that the Governor's reliance upon his disciplinary violations

18 committed in prison over seventeen years ago failed to support the Governor's finding of

19 current dangerousness.  (*See id.* at 5.)  Finally, petitioner claims that the Governor's parole

20 denials have "converted [petitioner's] 15 years to life sentence into a sentence of life without

21

22      [3] We do not reach petitioner's claim that his state due process rights were violated, as state claims are not cognizable in a federal habeas petition. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (asserting that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

01  any possibility of parole, which is clearly a prohibited result in light of the California parole

02  statutes and current state and federal case law regarding release on parole."  (*See id*. at 6.)

03       Respondent argues that petitioner does not have a constitutionally protected liberty

04  interest in being released on parole, and that the "some evidence" standard is inapplicable in

05  this context.  (*See* Dkt. 6 at 4-5 and 8-11.)  Even if he does have a protected liberty interest,

06  respondent contends that the Governor adequately predicated his denial of parole on "some

07  evidence."  (*See id*. at 11-13.)  Accordingly, respondent asserts that petitioner's due process

08  rights were not violated by the Governor's 2005 and 2006 decisions.

09       VI.     STANDARD OF REVIEW AND REQUIRED SHOWINGS

10       The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

11  petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

12  320, 326-27 (1997).  Because petitioner is in custody of the California Department of

13  Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

14  vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)

15  (providing that § 2254 is "the exclusive vehicle for a habeas petition by a state prisoner in

16  custody pursuant to a state court judgment, even when the petitioner is not challenging his

17  underlying state court conviction.").  Under AEDPA, a habeas petition may not be granted

18  with respect to any claim adjudicated on the merits in state court unless petitioner

19  demonstrates that the highest state court decision rejecting his petition was either "contrary to,

20  or involved an unreasonable application of, clearly established Federal law, as determined by

21  the Supreme Court of the United States," or "was based on an unreasonable determination of

22  the facts in light of the evidence presented...."  28 U.S.C. § 2254(d)(1) and (2).

REPORT AND RECOMMENDATION - 13

01        As a threshold matter, this Court must ascertain whether relevant federal law was

02   "clearly established" at the time of the state court's decision.  To make this determination, the

03   Court may only consider the holdings, as opposed to dicta, of the U.S. Supreme Court.  *See*

04   *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit precedent

05   remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

06    331 F.3d 1062, 1069 (9th Cir. 2003).

07        The Court must then determine whether the state court's decision was "contrary to, or

08   involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

09   *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

10   grant the writ if the state court arrives at a conclusion opposite to that reached by [the

11   Supreme] Court on a question of law or if the state court decides a case differently than [the]

12   Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

13   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

14   state court identifies the correct governing legal principle from [the] Court's decisions but

15   unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

16   times, a federal habeas court must keep in mind that it "may not issue the writ simply because

17   [it] concludes in its independent judgment that the relevant state-court decision applied clearly

18   established federal law erroneously or incorrectly.  Rather that application must also be

19   [objectively] unreasonable."  *Id.* at 411.  It is the petitioner's burden to establish that the state

20   court decision was contrary to, or involved an unreasonable application of, clearly established

21   federal law.  *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

22

REPORT AND RECOMMENDATION - 14

01          AEDPA also requires federal courts to give considerable deference to state court

02   decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

03   Federal courts are bound by a state's interpretation of its own laws.  *See Murtishaw v.*

04   *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

05   (9th Cir. 1993)).  This deference, however, is accorded only to a "reasoned decisions" by the

06   state courts.   To determine whether the petitioner has met this burden, a federal habeas court

07   looks to the last reasoned state court decision because subsequent unexplained orders

08   upholding that judgment are presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*,

09   501 U.S. 797, 803-04 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

10          In this case, after the Los Angeles County Superior Court denied petitioner's habeas

11   petition on the merits, petitioner filed petitions in the California Court of Appeal and

12   California Supreme Court.  (*See* Dkt. 6, Exs. 8 and 9.)  Both appellate courts denied the

13   petitions summarily.  (*See id*.)  Even the order of the Los Angeles County Superior Court,

14   upholding the Governor's decisions, fits only in part the description of a "reasoned decision"

15   addressing petitioner's claims.  While acknowledging that petitions challenging both reversals

16   (2005 and 2006) were pending before it, the superior court (for reasons which are not

17   apparent) explicitly limited its order to the challenge to the 2005 reversal.  (*See id*., Ex. 7 at

18   1.)  But all of the reasons expressed by the Governor for his 2006 reversal were repeats of

19   reasons he had expressed in 2005; and the Superior Court considered each of them in

20   reviewing the 2005 reversal.  This court should therefore regard the superior court decision as

21   the last reasoned decision of the state courts upholding the Governor's reversals, and should

22   accord that decision the deference required by AEDPA.

01       VII.    FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

02       A.    *Due Process Right to be Released on Parole*

03       Under the Fifth and Fourteenth Amendments to the United States Constitution, the

04 federal and state governments are prohibited from depriving an inmate of life, liberty or

05 property without the due process of law.  U.S. Const. amends. V, XIV.  A prisoner's due

06 process claim must be analyzed in two steps: the first asks whether the state has interfered

07 with a constitutionally protected liberty or property interest of the prisoner, and the second

08 asks whether the procedures accompanying that interference were constitutionally sufficient.

09 *Ky. Dep't of Corrections. v. Thompson*, 490 U.S. 454, 460 (1989); *Sass v. Cal. Bd. of Prison*

10 *Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006).

11       Accordingly, our first inquiry is whether petitioner has a constitutionally protected

12 liberty interest in parole.  The Supreme Court articulated the governing rule in this area in

13 *Greenholtz v. Inmates of Neb. Penal,* 442 U.S. 1 (1979), and *Board of Pardons v. Allen,* 482

14 U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

15 "the 'clearly established' framework of *Greenholtz* and *Allen"* to California's parole scheme).

16 The Court in *Greenholtz* determined that although there is no constitutional right to be

17 conditionally released on parole, if a state's statutory scheme employs mandatory language

18 that creates a presumption that parole release will be granted if certain designated findings are

19 made, the statute gives rise to a constitutional liberty interest.  *See Greenholtz*, 442 U.S. at 7,

20 12; *Allen*, 482 U.S. at 377-78.

21       As discussed *infra*, California statutes and regulations afford a prisoner serving an

22 indeterminate life sentence an expectation of parole unless, in the judgment of the parole

01  authority, he "will pose an unreasonable risk of danger to society if released from prison."

02  Title 15 Cal. Code Regs., § 2402(a).  The Ninth Circuit has therefore held that "California's

03  parole scheme gives rise to a cognizable liberty interest in release on parole." *McQuillion*,

04  306 F.3d at 902.  Similarly, *Irons v. Carey* held that California Penal Code § 3041 vests all

05  "prisoners whose sentences provide for the possibility of parole with a constitutionally

06  protected liberty interest in the receipt of a parole release date, a liberty interest that is

07  protected by the procedural safeguards of the Due Process Clause."  505 F.3d 846, 850 (9th

08  Cir. 2007).  This "liberty interest is created, not upon the grant of a parole date, but upon the

09  incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 915 (2003).  *See also Sass*, 461

10  F.3d at 1127.

11        Because the Board's denial of parole interfered with petitioner's constitutionally-

12  protected liberty interest, this Court must proceed to the second step in the procedural due

13  process analysis and determine whether the procedures accompanying that interference were

14  constitutionally sufficient.  "[T]he Supreme Court [has] clearly established that a parole

15  board's decision deprives a prisoner of due process with respect to this interest if the board's

16  decision is not supported by 'some evidence in the record.'" *Irons*, 505 F.3d at 851 (citing

17  *Superintendent v. Hill*, 472 U.S. 445, 457 (1985) (holding the "some evidence" standard

18  applies in prison disciplinary proceedings)).  The "some evidence" standard requires this

19  Court to determine "whether there is any evidence in the record that could support the

20  conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56.  Although *Hill*

21  involved the accumulation of good time credits rather than release on parole, later cases have

22  held that the same constitutional principles apply in the parole context because both situations

01    directly affect the duration of the prison term.  *See Jancsek v. Or. Bd. of Parole*, 833 F.2d

02    1389, 1390 (9th Cir. 1987) (adopting the "some evidence" standard set forth by the Supreme

03    Court in *Hill* in the parole context).  *Accord*, *Sass*, 461 F.3d at 1128-29; *Biggs*, 334 F.3d at

04    915; *McQuillion*, 306 F.3d at 904.

05         "The fundamental fairness guaranteed by the Due Process Clause does not require

06    courts to set aside decisions of prison administrators that have some basis in fact," however.

07    *Hill*, 472 U.S. at 456.  Similarly, the "some evidence" standard is not an invitation to examine

08    the entire record, independently assess witnesses' credibility, or re-weigh the evidence.  *Id.* at

09    455.  Instead, it is there to ensure that an inmate's loss of parole was not arbitrarily imposed.

10    *See id.* at 454.  The Court in *Hill* added an exclamation point to the limited scope of federal

11    habeas review when it upheld the finding of the prison administrators despite the Court's

12    characterization of the supporting evidence as "meager."  *See id.* at 457.

13         B.      *California Law Governing the Grant or Denial of Parole*

14         In order to determine whether "some evidence" supported the Governor's decisions

15    with respect to petitioner, this Court must consider the California statutes, regulations and

16    case law which govern decision-making by the Board and by the Governor.  *See Biggs*, 334

17    F.3d at 915.  Under California law, the Board is authorized to set release dates and grant

18    parole for inmates with indeterminate sentences.  *See* Cal. Penal Code § 3040 and 5075, *et*

19    *seq.*  Section 3041(a) requires the Board to meet with each inmate one year before the

20    expiration of his minimum sentence and normally set a release date in a manner that will

21    provide uniform terms for offenses of similar gravity and magnitude with respect to their

22    threat to the public, as well as comply with applicable sentencing rules.  Subsection (b) of this

01  section requires that the Board set a release date "unless it determines that the gravity of

02  current convicted offense or offenses, or the timing and gravity of current or past convicted

03  offense or offenses, is such that consideration of the public safety requires a more lengthy

04  period of incarceration." *Id.*, § 3041(b).  Pursuant to the mandate of § 3041(a), the Board must

05  "establish criteria for the setting of parole release dates" which take into account the number

06  of victims of the offense as well as other factors in mitigation or aggravation of the crime.

07  The Board has therefore promulgated regulations setting forth the guidelines it must follow

08  when determining parole suitability.  *See* 15 CCR § 2402, *et seq*.

09          Accordingly, the Board is guided by the following regulations in making a

10  determination whether a prisoner is suitable for parole:

11          (a) General. The panel shall first determine whether the life
             prisoner is suitable for release on parole. Regardless of the
12           length of time served, a life prisoner shall be found unsuitable
             for and denied parole if in the judgment of the panel the
13           prisoner will pose an unreasonable risk of danger to society if
             released from prison.

14
             (b) Information Considered. All relevant, reliable information
15           available to the panel shall be considered in determining
             suitability for parole. Such information shall include the
16           circumstances of the prisoner's social history; past and present
             mental state; past criminal history, including involvement in
17           other criminal misconduct which is reliably documented; the
             base and other commitment offenses, including behavior before,
18           during and after the crime; past and present attitude toward the
             crime; any conditions of treatment or control, including the use
19           of special conditions under which the prisoner may safely be
             released to the community; and any other information which
20           bears on the prisoner's suitability for release. Circumstances
             which taken alone may not firmly establish unsuitability for
21           parole may contribute to a pattern which results in a finding of
             unsuitability.

22

REPORT AND RECOMMENDATION - 19

01  15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability

02  factors to further assist the Board in analyzing whether an inmate should be granted parole,

03  although "the importance attached to any circumstance or combination of circumstances in a

04  particular case is left to the judgment of the panel." 15 CCR § 2402(c).

05          Under the California Constitution, any parole decision made by the Board regarding

06  prisoners sentenced to indeterminate sentences based upon a conviction of murder is subject

07  to review by the Governor within thirty days.  *See* Cal. Const. Art. V § 8(b).  Although the

08  Governor may only affirm, modify, or reverse the Board's decision based upon the same

09  factors which the Board is required to consider, the Governor undertakes an independent, *de*

10  *novo* review of the inmate's suitability for parole.  *See In re Lawrence*, 44 Cal.4th 1181, 1204

11  (2008).  If the Governor decides to reverse or modify the Board's decision, he or she must

12  "send a written statement to the inmate specifying the reasons for his or her decision."  15

13  CCR § 3041.2(b).

14          In examining its own statutory and regulatory framework, the California Supreme

15  Court in *In re Lawrence* held that the proper inquiry for a court reviewing a parole decision by

16  the Board or Governor is "whether some evidence supports the *decision* of the Board or the

17  Governor that the inmate constitutes a current threat to public safety, and not merely whether

18  some evidence confirms the existence of certain factual findings."  44 Cal.4th at 1212.  The

19  court also asserted that a parole decision must demonstrate "an individualized consideration"

20  of the specified criteria, but "[i]t is not the existence or nonexistence of suitability or

21  unsuitability factors that forms the crux of the parole decision; *the significant circumstance is*

22  *how those factors interrelate to support a conclusion of current dangerousness to the public.*"

01  *Id.* at 1204-05, 1212 (emphasis added).  Although the discretion of the Board and the

02  Governor in parole matters is very broad, they must offer "more than rote recitation of the

03  relevant factors with no reasoning establishing a rational nexus between those factors and the

04  necessary basis for the ultimate decision – the determination of current dangerousness." *Id.*

05  Thus, the penal code, corresponding regulations, and California law clearly establish that the

06  fundamental consideration in parole decisions is public safety and an assessment of a

07  prisoner's current dangerousness.  *See id.* at 1205-06.

08       C.    *Summary of Governing Principles*

09       By virtue of California law, petitioner has a constitutional liberty interest in release on

10  parole.  The parole authorities, in this case, the Governor, may decline to set a parole date

11  only upon a finding that petitioner's release would present an unreasonable present risk of

12  danger to society if he is released from prison.  Where the parole authorities deny release,

13  based upon an adverse finding on that issue, the role of a federal habeas court is narrowly

14  limited.  It must deny relief if there is "some evidence" in the record to support the parole

15  authority's finding of present dangerousness.  That is the determinative issue in this case.

16      VIII.   WAS THERE "SOME EVIDENCE" TO SUPPORT THE FINDING OF
               CURRENT DANGEROUSNESS?

17

18       Petitioner certainly *did, at one time*, pose an unreasonable risk of danger to society and

19  a threat to public safety.  The facts of the two murders, and his related activities, amply

20  support that conclusion.  He readily admitted that, in 1989, he was "a very violent gang

21  member."  (Dkt. 6, Ex. 2 at 30.)  Even after his conviction and incarceration, for the first four

22  years or so, he continued his gang affiliation, and (in his words), "everything that I was doing

on the streets I was still doing in prison…."  (*See id.*, Ex. 3 at 65.)

01      These facts, which lie at the heart of the Governor's reversals, would provide more

02 than ample support for his conclusions and would require this court to deny the petition; *but*

03 *only if this evidence is not vitiated by the passage of seventeen years and by evidence that*

04 *petitioner has radically changed in the meantime.*

05      It would not avail petitioner – at least not in a federal habeas court – if his remarkable

06 progress in the past seventeen years can only be *weighed against* the violence in his past.  The

07 federal habeas court is not permitted, under the applicable Supreme Court authorities, to

08 second-guess the Governor's weighing of suitability evidence against evidence of

09 unsuitability.  If petitioner's violent past remained probative of his current dangerousness, as

10 clarified by *Lawrence*, then the Governor could properly consider it, and this habeas petition

11 must be denied.

12      The issue of what evidence remains probative of current dangerousness in a California

13 parole hearing is governed by California law.  The California Supreme Court recently

14 addressed this issue at length in *Lawrence*.  This 2008 decision was filed after all of the

15 relevant decisions in this case: the two reversals by the Governor, and the state court denials

16 of habeas relief.

17      In *Lawrence,* the majority held:

18          In sum, the Board or the Governor may base a denial-of-parole
           decision upon the circumstances of the offense, or upon other
19          immutable facts such as the inmate's criminal history, but some
           evidence will support such reliance *only* if those facts support
20          the ultimate conclusion that an inmate *continues* to pose an
           unreasonable risk to public safety.  (Regs., §2281, subd. (a)).
21          Accordingly, the relevant inquiry for a reviewing court is not
           merely whether an inmate's crime was especially callous, or
22          shockingly vicious or lethal, but whether the identified facts are
           *probative* to the central issue of *current* dangerousness when

considered in light of the full record before the Board or the Governor.

*Lawrence*, 44 Cal.4th at 1221.

Applying that rule, the court in *Lawrence* held, "Accordingly, even as we acknowledge that some evidence in the record supports the Governor's conclusion regarding the gravity of the commitment offense, we conclude that there does not exist some evidence supporting the conclusion that petitioner *continues* to pose a threat to public safety." *Id*. at 1225.

In the present case, the record overwhelmingly establishes that all of the negative conduct upon which the Governor relied was directly related to petitioner's active participation in a gang. His gang involvement lay at the foundation of the murders, and of his misconduct during his first four years in prison. The record is also overwhelming and uncontradicted that petitioner terminated all involvement with gangs in 1989. In fact, his refusal to do what he was directed to do as a gang member (i.e., stab another person) put his own life at risk in 1992. Through his years of participation in the CGA program within the institution, he has worked to assist others to understand why they became involved in gangs, and why it is crucial that they withdraw. He has also committed to continue this work with others after his release, even in Mexico.

In *Lawrence*, the California Supreme Court recognized that "the possibility of parole acts as an incentive – encouraging good behavior and discouraging misconduct by confined prisoners. Failure to consider a prisoner's postconviction behavior when evaluating suitability for parole would undermine the practical institutional benefits of this regulatory incentive." *Id*. at 1220, n.19. The court added: "[t]he Legislature considered the passage of

01  time - and the attendant changes in a prisoner's maturity, understanding, and mental state - to

02  be highly probative to the determination of current dangerousness." *Id*. at 1219-20.

03      The manifest change in petitioner's outlook, and in his behavior, severs the probative

04  link between his past gang-related conduct and any determination of his dangerousness, as of

05  2006.  For the reasons set forth in *Lawrence,* the circumstances of petitioner's commitment

06  offenses, and his conduct during his first four yours in prison, did not constitute "some

07  evidence" of his dangerousness in 2006.

08      In denying release, the Governor also noted the Los Angeles County District

09  Attorney's opposition.  (Dkt. 6, Ex. 4 at 3; *id*., Ex. 5 at 2.)  During petitioner's 2005 Board

10  hearing, the district attorney argued that his office's opposition was based entirely upon

11  petitioner's "life crime and the other crime."  (*See id*., Ex. 2 at 76.)  Specifically, the district

12  attorney urged the Board to "keep in mind the degree of violence, the fact that we have

13  multiple victims and [petitioner's] role in these crimes that were carried on over a period of

14  time."  (*Id*. at 78.)  Even while opposing petitioner's release, however, the district attorney

15  admitted, "I would again indicate that I believe [petitioner has] made as much progress as any

16  inmate I've seen since I've been doing these parole hearings.  Both in terms of advancing

17  educationally, doing the self-help and also setting up very solid parole and probation plans."

18  (*Id*.)

19      During the 2006 Board hearing, the Los Angeles District Attorney again argued that

20  petitioner should be found unsuitable for parole, and based his recommendation upon

21  petitioner's commitment offense, prior criminal record, and disciplinary violations in prison.

22  (*See id*., Ex. 3 at 88-95.)  Despite his recommendation, the district attorney admitted to the

REPORT AND RECOMMENDATION - 24

01 panel that petitioner was "as impressive an individual as I have seen in terms of evidencing a

02 changed attitude by an admitted hard core gang member…." (*See id*. at 88.)  He also

03 observed that petitioner demonstrates "remarkable insight," and stated he believes petitioner's

04 statements to the panel were "sincere."  (*See id*.)

05       In making a suitability determination, the Board and Governor must "take into account

06 all pertinent information and input about the particular case from the inmate's victims, the

07 officials familiar with his or her criminal background, and other members of the public who

08 have an interest in the grant or denial of parole to this prisoner."  *In re Dannenberg,* 34

09 Cal.4th 1061, 1086 (2005).  California law provides that a prosecutor may attend a parole

10 hearing to represent "the interests of the people," and may "comment on the facts of the case

11 and present an opinion about the appropriate disposition."  *See* Cal. Penal Code § 3041.7; 15

12 CCR § 2030.  Thus, the Governor's consideration of the district attorney's statements was

13 appropriate, and was not arbitrary and capricious.

14       In the absence of other reliable evidence of unsuitability in the record, however,

15 opposition by law enforcement based upon the nature of the commitment offense does not

16 constitute "some evidence" to support parole denial.  *See Rosenkrantz v. Marshall,* 444 F.

17 Supp. 2d 1063, 1080 n.14 (C.D. Cal. 2006) (holding that "some evidence" did not support the

18 Board's denial of parole where it "simply noted the opposition" by the district attorney, and

19 such opposition was "merely cumulative" of the Board's own determination).  With

20 petitioner's conduct up until 1989 eliminated from consideration, the opposition by the district

21 attorney stands alone.  Without more, the district attorney's opposition to petitioner's release

22 on parole does not constitute "some evidence" that petitioner would have posed an

01  unreasonable risk of danger to society if released on parole.

02      IX.     LOS ANGELES COUNTY SUPERIOR COURT DECISION

03          As discussed in Part III *supra*, "[u]nder the 'unreasonable application' clause, a

04  federal habeas court may grant the writ if the state court identifies the correct governing legal

05  principle from this Court's decisions but unreasonably applies that principle to the facts of the

06  prisoner's case."  It now appears the Los Angeles Superior Court correctly recognized the

07  standard under *Hill*; but did not foresee the holding of *Lawrence*, that under the facts of this

08  case, the conduct of Hernandez through 1989 was no longer probative of his current

09  dangerousness.  Therefore, his continued incarceration was a violation of the federal

10  principles announced in *Hill*.  For the reasons discussed above, *Lawrence* requires the

11  conclusion that there was not "some evidence" to support the Governor's finding of

12  petitioner's dangerousness in 2006.

13          It is worth noting that another district court recently reached the same conclusion in a

14  similar context.  Specifically, the Central District of California asserted in *Delaplane v.*

15  *Marshall* that "a federal court's application of the *Hill* 'some evidence' standard is informed

16  by the California Supreme Court's explication in *Lawrence* of what evidence is necessary

17  under California law to support the Board's or the Governor's decision that an inmate is

18  unsuitable for parole."  2009 WL 3806261, *1 (C.D. Cal. November 12, 2009).  Because "in

19  *Lawrence*, the California Supreme Court made clear that it was merely clarifying existing

20  California law … it is irrelevant that *Lawrence* was handed down after the Governor issued

21  his decision regarding Petitioner's suitability for parole, and after the state court applied the

22  'some evidence' standard to the Governor's decision."  *Id*. at *2.  "When a court has

01  concluded that the record does not contain 'some evidence' to support the Governor's

02  determination that an inmate is unsuitable for parole, a remand to the Governor would not

03  serve any purpose, and the proper disposition is to reinstate the Board's decision…." *Id*. at

04  *1.

05      Finally, this Court is aware that *Hayward v. Marshall*, a case pending for decision

06  before a limited en banc panel in the U.S. Court of Appeals for the Ninth Circuit, presents

07  issues sufficiently similar to those in this case that it seems likely the en banc decision will

08  have significant implications for the resolution of petitioner's case.  512 F.3d 536 (9th Cir.

09  2008), *reh'g en banc granted*, 527 F.3d 797 (9th Cir. 2008).  If *Hayward* is decided while this

10  Report and Recommendation is pending before the presiding U.S. District Judge, he will be

11  able to take that decision into account in ruling upon this case.

12          X.      "CONVERSION OF SENTENCE" CONTENTION WITHOUT MERIT

13      Petitioner's remaining argument is that the Governor's parole denials have "converted

14  [petitioner's] 15 years to life sentence into a sentence of life without any possibility of parole,

15  which is clearly a prohibited result in light of the California parole statutes and current state

16  and federal case law regarding release on parole."  (*See* Dkt. 1 at 6.)  In support of his

17  contention, petitioner cites two decisions by the California Court of Appeal and § 2402(a) of

18  title 15 of the California Code of Regulations.  (*See id*.)

19      Even construed liberally, the federal constitutional basis of petitioner's claim is

20  unclear.  In this Circuit, petitioners must "make the federal basis of the claim explicit either

21  by specifying particular provisions of the federal Constitution or statutes, or by citing to

22  federal case law."  *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005) (citing *Lyons*

01 *v. Crawford*, 232 F.3d 666, 668, 670 (9th Cir. 2000), *as modified by* 247 F.3d 904 (9th Cir.

02 2001)).  According, petitioner's argument is unavailing.

03       XI.      CONCLUSION

04       For the reasons stated above, this Court finds that there was no evidence that as of

05 June 9, 2006, the date of the Governor's 2006 parole decision, petitioner would have posed an

06 unreasonable risk of danger to society or threat to public safety if released from prison.

07 Accordingly, petitioner's federal due process rights were violated, and the California Supreme

08 Court's April 16, 2007, decision upholding the Governor's parole denial was an unreasonable

09 application of clearly established federal law.  It is therefore recommended that the District

10 Court issue an order (1) approving and adopting this Report and Recommendation;

11 (2) directing that Judgment be entered granting a writ of habeas corpus; and (3) directing the

12 Board, within thirty days after the Judgment in this case becomes final, to set a date on which

13 petitioner shall be released from prison and begin his period of parole supervision.  In

14 calculating his period of parole supervision, the Board shall give petitioner credit for time

15 spent in prison when he would not have been incarcerated, but for the Governor's decision in

16 2006.

17       This Report and Recommendation is submitted to the United States District Judge

18 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty (20)

19 days after being served with this Report and Recommendation, respondent may file written

20 objections with this Court.  Those objections may, if respondent chooses, be accompanied by

21 a properly documented factual showing, setting forth new, relevant and reliable evidence of

22 petitioner's conduct in prison or change in mental status subsequent to the January 19, 2006,

REPORT AND RECOMMENDATION - 28

01   parole consideration hearing sufficient to support a finding that petitioner *currently* poses an

02   unreasonable risk of danger to society if released on parole.[4]   Such a document should be

03   captioned "Objections to Magistrate Judge's Report and Recommendation," and respondent

04   shall serve a copy on all parties.   Failure to file objections within the specified time may

05   waive the right to appeal the District Court's Order.   *See Martinez v. Ylst*, 951 F.2d 1153 (9th

06   Cir. 1991).   A proposed order accompanies this Report and Recommendation.

07          DATED this 1st day of March, 2010.

09

10                                                JOHN L. WEINBERG
                                                 United States Magistrate Judge

---

[4] This Court is aware that petitioner appeared before the Board for a subsequent parole consideration hearing on July 2, 2007, and was found unsuitable for parole.   (*See* Dkt. 7 at 25 fn.3.)   This Court has not reviewed the evidence presented to the Board during the 2007 hearing, however, as the issue in this case is whether the state courts properly found "some evidence" to support the Governor's 2005 and 2006 parole denials.   Furthermore, as of the date of this Report and Recommendation, there is no indication in the record that petitioner has filed a federal habeas petition challenging the Board's 2007 decision.

REPORT AND RECOMMENDATION - 29