01

02

03

04

05

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

06 RICARDO HERNANDEZ,                    )
                                          )
07          Petitioner,                   )     CASE NO. 2:07-cv-00839-RSL-JLW
                                          )
08      v.                                )
                                          )
09 R.J. SUBIA, Warden,                    )     REVISED REPORT AND
                                          )     RECOMMENDATION[1]
10          Respondent.                   )
   _____        )
11

12      I.      SUMMARY

13          Petitioner Ricardo Hernandez is currently incarcerated at the Mule Creek State Prison

14 in Ione, California.  Upon his conviction in 1985 of two counts of second degree murder, and

15 assault with a deadly weapon, he was sentenced to a term of fifteen-years-to-life with the

16 possibility of parole, and a concurrent term of six years on the assault charge.

17          In 2005, the Board of Parole Hearings of the State of California (the "Board")[2]

18 granted his application for release on parole.  But Governor Arnold Schwarzenegger reversed

19

20          [1] This Court previously submitted a Report and Recommendation in this case dated March 1, 2010.
   (*See* Docket 20.)  While the Report and Recommendation was pending before the assigned district judge,
21 however, the Ninth Circuit Court of Appeals issued an en banc decision which addressed issues similar to those
   raised in this case.  *See Hayward v. Marshall*, --- F.3d ---, 2010 WL 1664977 (9th Cir. Apr. 22, 2010) (en banc).
   As a result, this matter was re-referred for any proceedings deemed necessary by the undersigned.  (*See* Dkt. 23.)
22 This Revised Report and Recommendation replaces and supersedes the original Report and Recommendation.
          [2] The Board of Parole Hearings replaced the Board of Prison Terms, which was abolished on July 1,
   2005.  *See* California Penal Code § 5075(a).

REVISED REPORT AND RECOMMENDATION - 1

01  that decision, and denied parole.  The same sequence was repeated in 2006: a new hearing, a

02  new grant by the Board, but again a reversal by the Governor.  Having exhausted his remedies

03  in the courts of California, petitioner seeks federal habeas corpus relief, under 28 U.S.C.

04  § 2254.

05      Petitioner had been in custody for almost twenty years at the time of his 2005 hearing

06  – and over twenty-four years as of this writing.

07      The Court, having thoroughly reviewed the record and briefing of the parties,

08  recommends that the Court find as follows:

09  (1)  The U.S. Supreme Court has clearly held that where a state statutory scheme
        includes mandatory language that creates a presumption of parole release
10       based on certain designated findings, that statute gives rise to a federal
        constitutional liberty interest in parole;

11

12  (2)  California statutes and regulations contain such mandatory language;

13  (3)  That language provides that a prisoner serving an indeterminate life sentence
        has an expectation of parole release unless the Board or Governor finds that he
        will pose an unreasonable risk of danger to society if released on parole;

14

15  (4)  The California Supreme Court has interpreted this statutory language to
        provide that an adverse parole decision must be supported by "some evidence"
16       of current dangerousness;

17  (5)  Whether "some evidence" of current dangerousness exists is to be determined
        in accordance with California law;

18  (6)  Applying these standards, the record in this case does not contain "some
        evidence" of petitioner's dangerousness when the Governor denied his parole
19       in 2005 and 2006;

20  (7)  The denial of parole therefore violated petitioner's federal due process rights,
        and the decision of the California Supreme Court upholding the denial was an
21       unreasonable application of clearly established federal law; and

22  (8)  The Court should therefore grant the petition for a writ of habeas corpus.

REVISED REPORT AND RECOMMENDATION - 2

01     II.     FACTUAL BACKGROUND[3]

02     In January 1985, the date of the assault offense, petitioner was twenty-one years of

03 age, and lived with his large family in Compton, California.  He was associated with a gang,

04 the "Tortilla Flats."  Before his 1985 offenses, he had a prior conviction for spray-painting a

05 wall with graffiti, and a misdemeanor conviction for possession of a controlled substance.

06     On January 11, 1985, petitioner and two co-defendants, both of whom were minors,

07 confronted Pedro Gil at his residence about a prior incident in which Gil nearly ran over

08 petitioner with a car.  (*See* Dkt. 6, Exhibit 3 at 9.)  After petitioner allegedly threatened Gil,

09 one of the minors shot Gil in the chest and injured him.  (*See id*.)  Petitioner later pled guilty

10 to assault with a deadly weapon for his role in this offense.

11     Petitioner's murder convictions arose from a gang-related shooting that took place on

12 June 16, 1985, about five months later.  (*See id*. at 10.)  Members of a rival street gang, "the

13 Rebels," drove into petitioner's neighborhood to "settle" a dispute between the two gangs

14 which had taken place earlier that day.  (*See id*.)  A fight broke out when members of the

15 "Rebels" began throwing bottles and other objects at "Tortilla Flats" gang members.  (*See id*.)

16 After several members of the "Rebels" tried to scale a fence in order to harm petitioner, who

17 was on the other side, petitioner retrieved a rifle from one of his friends and began firing.

18 According to petitioner, he missed the persons climbing the fence, but hit two other members

19 of the "Rebels" who were sitting in the back of a pick-up truck.  (*Id*.)  Petitioner's shooting

20 resulted in the deaths of Andrews Ortega and David Flores.  (*See id*. at 10-11.)

21 ───────────────

22     [3] The record before this Court includes transcripts of both hearings before the Board.  The factual evidence at those two hearings is consistent in all relevant respects, except that the second hearing contains additional evidence as to petitioner's employment plans.  The transcripts of both hearings were available to the Governor when he denied parole in 2006, and this factual summary draws upon facts set forth in both transcripts.

01        Petitioner pled guilty to two counts of second degree murder with the use of a deadly

02   weapon, and one count of assault with a deadly weapon in Los Angeles County Superior

03   Court on December 12, 1985.  (*See id*., Ex. 6 at 1.)  He received two concurrent terms of

04   fifteen-years-to-life with the possibility of parole for the murder charges, and a six-year term

05   for the assault charge to run concurrently with his life sentence.  (*See id*.)  His minimum

06   eligible parole date was set for June 24, 1995.  (*See id*., Ex. 3 at 1.)

07        At his parole hearings, petitioner volunteered the fact that he had also been involved in

08   two drive-by shootings during approximately the same period as the offenses for which he

09   was convicted.  He was never charged for this conduct, and does not know whether there were

10   any resulting injuries.  (*See id*., Ex. 2 at 16-17.)

11        During his first several years in prison, petitioner continued his gang affiliation.  In

12   1986, an inmate was stabbed on the weight pile at San Quentin.  Petitioner was charged as the

13   assailant and given 15 months in the Security Housing Unit ("SHU"), but he steadfastly

14   denies any involvement in the stabbing.  (*See id*., Ex. 3 at 69-70.)  On a different occasion,

15   petitioner was charged with using force and violence in the yard, but that was later reduced to

16   a less serious infraction.  When petitioner was at Chino in 1987, he was disciplined for

17   possession of a double-edged razor blade.  He explained, "I was told through gang traditions

18   that you always have to arm yourself, because you're going to be challenged and you have to

19   meet the challenge . . . I think the razor blade was found in the cell.  It was used for cutting

20   cardboard, but it is dangerous contraband and I took responsibility for it."  (*See id*. at 70-71.)

21   He was also disciplined for possession of marijuana, and for possession of an inmate-made

22   metal weapon.  All of this occurred during his first four years in prison.

REVISED REPORT AND RECOMMENDATION - 4

01          In 1989, however, petitioner made an abrupt, positive change in his behavior.  At the

02  2006 hearing, the Presiding Commissioner of the Board asked:

03          PRESIDING COMMISSIONER GARNER:  What happened in
            1989 that turned you around? You had a lot of trouble, it seems,
04          adjusting.  Was there any one event or revelation that came to
            you that got you turned around?

05
            INMATE HERNANDEZ: Yes, it did.  Having my mother come
06          see me in San Quentin in the SHU, behind a granite wall and
            through a small window and seeing me in shackles, and seeing
07          the tears fall from her eyes.  That day told me that I need to
            change, because everything that I was doing on the streets I was
08          still doing in prison, and seeing her and the sadness in her eyes
            led me to the (indiscernible) where I am today.

09
    (*Id*. at 64-65.)

10
11          Most significantly, petitioner terminated his gang affiliations.  In 1992 he was ordered

12  by members of the "Mexican Mafia" to stab another individual within the prison.  Petitioner

13  told the Board that he had no affiliation with the Mexican Mafia.  But, "[o]nce you're in a

14  SHU in any prison, the Mexican Mafia runs the SHU.  In order for you to stay out of the SHU

15  you have to play by the rules, and I was done after seeing my mom, following those rules.  So

16  I refused to do it."  (*See id*. at 72-73.)  As a result of his refusal, petitioner himself was

17  stabbed in 1992.

18          Commenting on these two events, the Board observed that "[e]ither of those could be a

19  life altering [event] for [petitioner] and whichever one it was, [it] worked."  (*Id*. at 114.)

20          The record of progress and achievement by petitioner since 1989 fully bears out that

21  observation.  He had no significant disciplinary problems starting in 1989, and continuing for

22  at least seventeen years through the 2006 parole hearing.  But above and beyond the lack of

    trouble, he has compiled an exemplary record of achievement.

REVISED REPORT AND RECOMMENDATION - 5

01        Petitioner has been involved in a wide variety of self-help and therapy programming

02  within the institution.  The most significant, for him, has been his extensive involvement with

03  the 12-step Criminal Gangs Anonymous ("CGA") program.  (*See id*. at 45 and 112.)

04  Specifically, petitioner has served as a facilitator in the CGA program, and he personally

05  developed the CGA Spanish program in 2003.  (*See id*. at 55-56.)   During the 2005 hearing

06  he told the Board that, through the CGA program, he developed insight into why he became

07  involved in gang activity:

08              I was always a chubby kid and . . . I still am.  I'm a chubby man
             now, but back then the bullying I received at school and as a
09           little kid, it hurt me.  And I got to a certain age that I got tired of
             all the bullying and the laughter.  And people used to look at
10           me, I felt . . . with disgust and I wanted to change that.  I tried
             sports and that didn't help.  My family has always been loving
11           to me, you know, and I've always known that, but it wasn't
             enough.  And it wasn't until I joined that gang that it got me
12           what I felt that I needed, the acceptance.  You know, people
             didn't look at me as a fat kid no more.  And it wasn't because
13           all the [sic] sudden they loved me, because I became a very
             violent gang member. And that brought me the acceptance and
14           once I got it, I couldn't stop doing it . . . . See, at that time, I felt
             that if I didn't do it . . . that I would lose everything that I
15           believed that I had gained, the status.

16  (*Id*., Ex. 2 at 30-31.)

17        The CGA program also provided him insight regarding the commitment offense:

18              PRESIDING COMMISSIONER GARNER: When did you first
             come to grips with the commitment offense and have – start
19           having feelings of remorse for what you'd done?

20              INMATE HERNANDEZ: I removed all those defects in
             character that didn't allow me to see the enormity of what I did.
21           Because I've always felt justified. A gang member was justified
             because the other guys were gang members.  And when I didn't
22           [sic] remove those defects of character within me and took full
             responsibility, that's when I saw the enormity of what I had

REVISED REPORT AND RECOMMENDATION - 6

01

02

03

04
                     done.  I had no shields to see that through, to guide me from
                     that.  I seen beyond those two persons being gang members, and
                     I seen them as David and Andres, with families just like I had.
                     Before I didn't allow myself to see that.  It helped me to
                     withstand all the time that I been in prison.  Once I removed all
                     those defects in character, I saw how I impacted their families.

(*Id*., Ex. 3 at 65-66.)

Petitioner made these comments regarding the commitment offense at his second

hearing.  But they were an echo of his statements at the first hearing: "[w]hen it happened, my

beliefs were that I was defending not only myself, but my neighborhood, the reputation of our

neighborhood.  Back then, I thought that I was doing the right thing.  And back then, I saw the

gang members as gang members.  And throughout the years, as far as becoming a mature

adult and through recovery, I've learned that they were human beings."  (*See id*., Ex. 2 at 22.)

Among other activities, petitioner has "worked with the [Enhanced Outpatient

Program] organizing sports and talent shows," completed a 60-day workshop on the Benefits

of Self-Honesty and Truthfulness with Others, participated in Alcoholics Anonymous and

Narcotics Anonymous, and written book reports describing the lessons he learned by reading

self-help books during his free-time in prison.  (*See id*., Ex. 3 at 44-45, 50-53, and 112.)

The Board also found that petitioner's institutional activities indicate an enhanced

ability to function within the law upon release.  *See* Title 15 Cal. Code Regs., § 2402(d)(9).

For example, petitioner has "what's perceived to be one of the more prestigious jobs that an

inmate can get, and that's working as a Clerk.  [He has] received excellent work reports. . . ."

(Dkt. 6, Ex. 3 at 111.)  His vocational accomplishments include completion of the Furniture

Refinishing Program in 1995, as well as the Vocational Electronics Program in 2003.  (*See id*.

at 43.)  Petitioner also improved himself educationally by earning his GED in 1989.  (*See id*.

REVISED REPORT AND RECOMMENDATION - 7

01  at 112.)

02      Petitioner's "maturation, growth, and . . . greater understanding," as well as his signs

03  of remorse, were also cited by the Board as factors indicating petitioner's suitability for

04  parole.  (*See id*. at 113-114.)  *See* 15 CCR § 2402(d)(3) and (7).  The Board observed that

05  petitioner is "older, [although he is certainly not] an advanced age.  [He has] got a lot of time

06  left to make good.  [He has] got a very reduced probability of recidivism."  (Dkt. 6, Ex. 3 at

07  113.)  It also noted that his actions indicate the presence of "remorse, and [that he]

08  understand[s] the nature and the magnitude of the offense, and accept[s] . . . responsibility for

09  [his] behavior, and [his] desire to change toward good citizenship."  (*Id*. at 114.)

10      The Governor acknowledged petitioner's participation in "self-help and therapy,

11  including Alcoholics Anonymous and Narcotics Anonymous, Special Recovery, Honesty &

12  Truthfulness, Grief Ministry Group, Amer-i-can program, and Criminal & Gang Members

13  Anonymous.  He has earned numerous laudatory chronos, and has received favorable reports,

14  inclusive of some low risk assessments, from correctional and mental-health professionals."

15  (*Id*., Ex. 5 at 2.)  Furthermore, the Governor noted petitioner's ability to maintain close

16  relationships with others, as well as his "confirmed plans to reside [in Mexico] with a family

17  friend" upon his release.  (*Id*.)  The Board's 2006 decision noted that petitioner has

18  experienced reasonably stable relationships with others, because he managed to maintain

19  "extremely close family ties" with his "very large" and "very successfully family" throughout

20  his incarceration.  (*See id.*, Ex. 3 at 113.)  *See* 15 CCR § 2402(d)(2).  The Board observed that

21  petitioner's family has expressed "their willingness to help [petitioner] spiritually, financially,

22  [with] pretty much anything [he] need[s].  Not many people are blessed with that, and

REVISED REPORT AND RECOMMENDATION - 8

01  [petitioner is] lucky to have it." (Dkt. 6, Ex. 3 at 113.)

02      Petitioner's 2004 psychological evaluation assessed his "violence potential in the free

03  community" as "minimal," and asserted that petitioner will "use [his] insight and leadership

04  skills in a pro-social way" upon his release from prison. (*Id*. at 114-15.) His 2001

05  psychological evaluation also asserted that if petitioner is released into the free community, he

06  will "maintain [his] current non-violent character . . . what appears to be an excellent ability to

07  get along with others, and a genuine willingness to work directly and honestly with the

08  problems." (*Id*. at 57-62 and 115.)

09      The applicable regulations require the Board to consider a prisoner's "understanding

10  and plans for the future," including a prisoner's "realistic plans for release or . . . marketable

11  skills that can be put to use upon release" as a factor tending to indicate suitability for parole.

12  *See* 15 CCR § 2402(d)(8). Petitioner is a Mexican national; and while he states that his

13  presence in this country has been legal, he acknowledges it is very likely he will be deported

14  or removed to Mexico if he is released on parole. Accordingly, at both Board hearings,

15  petitioner and his counsel presented evidence as to how, where, and by whom he would be

16  employed upon his return to Mexico.

17      In reviewing the 2005 Board decision, the Governor found petitioner had not shown

18  his employment plans were "viable or realistic." (Dkt. 6, Ex. 4 at 2.) During the 2006 parole

19  hearing, however, petitioner provided the Board with detailed documentation of his

20  employment plans in Mexico. (*See id*., Ex. 3 at 26-39.) As a result, the Governor's 2006

21  decision noted that "[a]s a Mexican national subject to deportation upon release, [petitioner]

22  has made confirmed plans to reside there with a family friend, and plans to work at a friend's

01     hardware store.  He also has made alternate plans, in case he is paroled to California. . . .”

02     (*See id.*, Ex. 5 at 2.)  The Governor then concluded that petitioner’s parole plans constituted a

03     factor “supportive of Mr. Hernandez’s release from prison.” (*Id.*)  Thus, there were some

04     defects in petitioner’s 2005 parole plans, although these defects may not have been fatal.

05     Regardless, these defects were cured in 2006.  For purposes of this Court’s review, there

06     remains no issue as to whether petitioner has shown acceptable employment plans.

07         III.        DECISIONS BY THE BOARD; REVERSALS BY THE GOVERNOR

08         Petitioner’s sixth and seventh overall parole consideration hearings were held on

09     January 21, 2005, and January 19, 2006, respectively.  (*See id.*, Exs. 2 and 3.)  At both

10     hearings, the Board concluded that petitioner was suitable for parole and would not pose an

11     unreasonable risk of danger to society or threat to public safety if released from prison.  (*See*

12     *id.*, Ex. 2 at 90; *id.*, Ex. 3 at 111.)  The Board in 2005 characterized it as a “tough decision”

13     because of the seriousness of gang violence, and public concerns about it.  But the Board

14     concluded,

15
16
17
18
                it appears that you have made significant turnarounds and we feel that, listening to your testimony and reading your files, it sounds that you’re genuinely repentant.  Not only that, it appears that you have tried to make some amends for what you did and you’re trying to become productive.  And the bottom line is, a good citizen.  While imprisoned, we feel that you’ve enhanced your ability to function within the law upon release by participating in educational programs.

19

20     (*Id.*, Ex. 2 at 90-91.)  The Presiding Commissioner added, “We also looked at maturation.

21     Because of maturation, growth, greater understanding and advanced age, we feel that that

22     [sic] have reduced your probability of recidivism.  We do feel that you have realistic parole

    plans, which include a job offer.  However, we are going to make it a special condition of

01 parole that you not reside in Compton, California . . . We are going to approve your parole

02 plans for Mexico." (*Id*. at 93-94.)

03       The Board's 2005 decision became final on May 21, 2005. (*See id*. at 105.)  The

04 Governor, however, exercised his authority pursuant to Article V, Section 8, Subdivision (b)

05 of the California Constitution to reverse the Board's decision.  (*See id*., Ex. 4.)  *See also* Cal.

06 Penal Code § 3041.2.  The Governor relied primarily upon the facts of the commitment

07 offense, but also cited petitioner's prior criminal history, his disciplinary record in prison, and

08 the Los Angeles District Attorney's opposition to parole.  (*See* Dkt. 6, Ex. 4 at 1-3.)  As

09 mentioned above, he also asserted that petitioner's parole plans were insufficient.  (*Id*. at 2.)

10 The factors discussed in the Governor's decision are among those listed as unsuitability and

11 suitability factors in § 2402(b), (c) and (d) of title 15 of the California Code of Regulations.

12 The Governor concluded that evidence of petitioner's progress in prison did not outweigh

13 evidence of his unsuitability for parole.  (*See* Dkt. 6, Ex. 4 at 3.)

14       The procedural history in 2006 was very similar.  After a new hearing, conducted on

15 January 19, 2006, the new Board reached the same conclusion: "you're suitable for parole and

16 you wouldn't pose an unreasonable risk of danger to society or a threat to public safety if

17 you're released from prison."  (*Id*., Ex. 3 at 111.)  The Board cited many of the positive things

18 petitioner had done while in prison, and the laudatory letters the Board had received in his

19 support.  They found his employment and housing plans in Mexico were "intact."  (*See id*. at

20 112.)  Relying in part upon the positive psychological reports, the Board found, "You've got a

21 very reduced probability of recidivism."  (*Id*.)

22

01        The Board's 2006 decision became final on May 19, 2006.  (*Id.* at 119.)  But less than

02   thirty days later, the Governor again reversed.  (*See id.*, Ex. 5.)  Although the Governor noted

03   petitioner's positive achievements while in prison, he reversed the grant of parole for reasons

04   which were basically the same as in the 2005 reversal, except that the Governor noted with

05   approval petitioner's employment plans.  (*See id.* at 1-3.)

06        At the time of the Governor's 2006 reversal, petitioner was forty-two-years-old, and

07   had been in custody approximately twenty-one years.  (*See id.*, Ex. 3 at 11.)

08        IV.      EXHAUSTION OF STATE COURT REMEDIES

09        Following the Governor's reversal of the Board's 2005 parole grant, petitioner filed a

10   habeas corpus petition in the Los Angeles County Superior Court.  (*See id.*, Ex. 7.)  On June

11   9, 2006, while petitioner's superior court petition was still pending, the Governor also

12   reversed the Board's 2006 parole grant.  (*See id.*, Ex. 5; *id.*, Ex. 7 at 1.)  Petitioner then

13   amended his superior court petition to include both the Governor's 2005 and 2006 parole

14   denials.  (*See id.*, Ex. 7.)  Although the superior court expressly considered the habeas petition

15   "filed on December 27, 2005, as amended on July 7, 2006," its order provided, "[t]his order is

16   limited to petitioner's challenge to the Governor's decision dated May 31, 2005," and denied

17   the request for habeas relief.  (*Id.* at 1.)

18        Petitioner filed habeas petitions in the California Court of Appeal and California

19   Supreme Court challenging the Governor's 2005 and 2006 parole reversals, but both petitions

20   were summarily denied.  (*See id.*, Exs. 8 and 9.)  This federal habeas petition followed.

21   Respondent admits that petitioner's habeas petition was timely, and petitioner properly

22   exhausted each of his claims before the California Supreme Court.  (*See* Dkt. 6 at 4.)

REVISED REPORT AND RECOMMENDATION - 12

01        V.        PARTIES' CONTENTIONS

02        Petitioner contends that the Governor violated his state and federal due process rights

03  by finding him unsuitable for parole in 2005 and 2006 without any evidence that he posed an

04  unreasonable risk of danger to society at that time.[4]  (*See* Dkt. 1 at 5.)  Specifically, petitioner

05  claims the Governor erred by finding him unsuitable based upon immutable factors that "will

06  never change," such as his commitment offense and prior criminal conduct, without

07  establishing "a rational nexus" between those immutable factors and a finding of current

08  dangerousness as required by California law.  (*See id*. at 4.)  In addition, petitioner argues that

09  the Governor's reliance upon his disciplinary violations committed in prison over seventeen

10  years ago failed to support the Governor's finding of current dangerousness.  (*See id*. at 5.)

11  Finally, petitioner claims that the Governor's parole denials have "converted [petitioner's] 15

12  years to life sentence into a sentence of life without any possibility of parole, which is clearly

13  a prohibited result in light of the California parole statutes and current state and federal case

14  law regarding release on parole."  (*See id*. at 6.)

15        Respondent argues that petitioner does not have a constitutionally protected liberty

16  interest in being released on parole, and that the "some evidence" standard is inapplicable in

17  this context.  (*See* Dkt. 6 at 4-5 and 8-11.)  Even if he does have a protected liberty interest,

18  respondent contends that the Governor adequately predicated his denial of parole on "some

19  evidence."  (*See id*. at 11-13.)  Accordingly, respondent asserts that petitioner's due process

20  rights were not violated by the Governor's 2005 and 2006 decisions.

21  _____

22        [4] We do not reach petitioner's claim that his state due process rights were violated, as state claims are
not cognizable in a federal habeas petition.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (asserting that "it
is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

REVISED REPORT AND RECOMMENDATION - 13

01      VI.     STANDARD OF REVIEW AND REQUIRED SHOWINGS

02      The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

03 petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

04 320, 326-27 (1997).  Because petitioner is in custody of the California Department of

05 Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

06 vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)

07 (providing that § 2254 is "the exclusive vehicle for a habeas petition by a state prisoner in

08 custody pursuant to a state court judgment, even when the petitioner is not challenging his

09 underlying state court conviction.").  Under AEDPA, a habeas petition may not be granted

10 with respect to any claim adjudicated on the merits in state court unless petitioner

11 demonstrates that the highest state court decision rejecting his petition was either "contrary to,

12 or involved an unreasonable application of, clearly established Federal law, as determined by

13 the Supreme Court of the United States," or "was based on an unreasonable determination of

14 the facts in light of the evidence presented. . . ."  28 U.S.C. § 2254(d)(1) and (2).

15      As a threshold matter, this Court must ascertain whether relevant federal law was

16 "clearly established" at the time of the state court's decision.  To make this determination, the

17 Court may only consider the holdings, as opposed to dicta, of the U.S. Supreme Court.  *See*

18 *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit precedent

19 remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

20  331 F.3d 1062, 1069 (9th Cir. 2003).

21      The Court must then determine whether the state court's decision was "contrary to, or

22 involved an unreasonable application of, clearly established Federal law."  *Lockyer v.*

REVISED REPORT AND RECOMMENDATION - 14

01  *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

02  grant the writ if the state court arrives at a conclusion opposite to that reached by [the

03  Supreme] Court on a question of law or if the state court decides a case differently than [the]

04  Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

05  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

06  state court identifies the correct governing legal principle from [the] Court's decisions but

07  unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

08  times, a federal habeas court must keep in mind that it "may not issue the writ simply because

09  [it] concludes in its independent judgment that the relevant state-court decision applied clearly

10  established federal law erroneously or incorrectly.  Rather that application must also be

11  [objectively] unreasonable."  *Id.* at 411.  It is the petitioner's burden to establish that the state

12  court decision was contrary to, or involved an unreasonable application of, clearly established

13  federal law.  *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

14       AEDPA also requires federal courts to give considerable deference to state court

15  decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

16  Federal courts are bound by a state's interpretation of its own laws.  *See Murtishaw v.*

17  *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme*, 998 F.2d 710, 713

18  (9th Cir. 1993)).  This deference, however, is accorded only to "reasoned decisions" by the

19  state courts.  To determine whether the petitioner has met this burden, a federal habeas court

20  looks to the last reasoned state court decision because subsequent unexplained orders

21  upholding that judgment are presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*,

22  501 U.S. 797, 803-04 (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

01          In this case, after the Los Angeles County Superior Court denied petitioner's habeas

02   petition on the merits, petitioner filed petitions in the California Court of Appeal and

03   California Supreme Court.  (*See* Dkt. 6, Exs. 8 and 9.)  Both appellate courts denied the

04   petitions summarily.  (*See id*.)  Even the order of the Los Angeles County Superior Court,

05   upholding the Governor's decisions, fits only in part the description of a "reasoned decision"

06   addressing petitioner's claims.  While acknowledging that petitions challenging both reversals

07   (2005 and 2006) were pending before it, the superior court (for reasons which are not

08   apparent) explicitly limited its order to the challenge to the 2005 reversal.  (*See id*., Ex. 7 at

09   1.)  But all of the reasons expressed by the Governor for his 2006 reversal were repeats of

10   reasons he had expressed in 2005; and the superior court considered each of them in

11   reviewing the 2005 reversal.  This Court should therefore regard the superior court decision as

12   the last reasoned decision of the state courts upholding the Governor's reversals, and should

13   accord that decision the deference required by AEDPA.

14          VII.    FEDERAL HABEAS CHALLENGES TO STATE PAROLE DENIALS

15          A.      *Due Process Right Under California's Parole Scheme*

16          Under the Fifth and Fourteenth Amendments to the U.S. Constitution, the federal and

17   state governments are prohibited from depriving an inmate of life, liberty or property without

18   the due process of law.  U.S. Const. amends. V, XIV.  A prisoner's due process claim must be

19   analyzed in two steps: the first asks whether the state has interfered with a constitutionally

20   protected liberty or property interest of the prisoner, and the second asks whether the

21   procedures accompanying that interference were constitutionally sufficient.  *Ky. Dep't of

22   Corrections. v. Thompson*, 490 U.S. 454, 460 (1989).

01          Accordingly, our first inquiry is whether petitioner has a constitutionally protected

02   liberty interest in parole.  The U.S. Supreme Court articulated the governing rule in this area

03   in *Greenholtz v. Inmates of Neb. Penal*, 442 U.S. 1 (1979), and *Board of Pardons v. Allen*,

04   482 U.S. 369 (1987).  *See McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (applying

05   "the 'clearly established' framework of *Greenholtz* and *Allen*" to California's parole scheme).

06   The Court in *Greenholtz* determined that although there is no constitutional right to be

07   conditionally released on parole, if a state's statutory scheme employs mandatory language

08   that creates a presumption that parole release will be granted if certain designated findings are

09   made, the statute gives rise to a constitutional liberty interest.  *See Greenholtz*, 442 U.S. at 7,

10   12; *Allen*, 482 U.S. at 377-78.  *See also Vitek v. Jones*, 445 U.S. 480, 488 (1980) ("We have

11   repeatedly held that state statutes may create liberty interests that are entitled to the procedural

12   protections of the Due Process Clause of the Fourteenth Amendment.").

13          As discussed *infra*, the California statutes and regulations at issue in this case contain

14   mandatory language providing that a prisoner serving an indeterminate life sentence has an

15   expectation of parole unless, in the judgment of the parole authority, he "will pose an

16   unreasonable risk of danger to society if released from prison."  15 CCR § 2402(a).

17   Specifically, California Penal Code § 3041(b) provides that the Board "*shall* set a release date

18   unless it determines . . . that consideration of the public safety requires a more lengthy period

19   of incarceration for this individual. . . ."  Cal. Penal Code § 3041(b) (emphasis added).  The

20   California Supreme Court has interpreted this language to provide that an adverse parole

21   decision must be supported by "some evidence" demonstrating current dangerousness.  *See In*

22   *re Lawrence*, 44 Cal.4th 1181, 1204 (2008); *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008).

01    Thus, the California Supreme Court has held that as a matter of state constitutional law, this

02    mandatory language in California's parole scheme creates a liberty interest in parole. *See*

03    *Lawrence*, 44 Cal.4th at 1204; *Shaputis*, 44 Cal.4th at 1254, 1258; *In re Rozenkrantz*, 29

04    Cal.4th 616, 654 (2002).

05         In addition, the Ninth Circuit recently considered this statutory language in *Hayward*

06    *v. Marshall*, and concluded that the appropriate inquiry for a federal habeas court is whether

07    "some evidence" of current dangerousness supported the Board or Governor's denial of

08    parole. *Hayward*, 2010 WL 1664977, at *11. In other words, the federal Due Process Clause

09    requires that California comply with its own quantum of evidence requirement. *See id*. at *17

10    (Berzon, J., concurring in part and dissenting in part) (asserting that "the majority is correct to

11    review the state court decision here for compliance with the California Constitution's

12    requirement of 'some evidence' of future dangerousness. The federal Due Process Clause

13    requires at least that much."). Accordingly, the majority in *Hayward* observed that it did not

14    need to decide "whether a right arises in California under the United States Constitution to

15    parole in the absence of some evidence of future dangerousness." *Id*. The *Hayward* court

16    could finesse this legal issue because it found, as a matter of fact, that the record contained

17    "some evidence" of Hayward's dangerousness. The present case, by contrast, requires the

18    resolution of the legal issue left open in *Hayward*, because the record does not contain

19    evidence which is cognizable, under California law, to support a finding of current

20    dangerousness.

21         What the majority failed to articulate, however, is the fact that a state prisoner's right

22    to federal habeas review of an adverse parole decision emanates from clearly established U.S.

01    Supreme Court precedent.  *See id.* at *14-15.  *See also Estelle*, 502 U.S. at 68 ("In conducting

02    habeas review, a federal court is limited to deciding whether a conviction violated the

03    Constitution, laws, or treaties of the United States."); 28 U.S.C. § 2241(c) ("The writ of

04    habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the

05    [United States] Constitution or laws. . . .").  The governing law in this context remains

06    *Greenholtz* and *Allen*.  This Court assumes that the Ninth Circuit in *Hayward* did not intend to

07    overrule decades of U.S. Supreme Court precedent holding that a federal liberty interest arises

08    from a state statute that employs mandatory language creating a presumption that parole

09    release will be granted if certain designated findings are made.  As a result, the undersigned

10    follows the same reasoning as the concurrence, and finds that while petitioner's liberty

11    interest in parole originates from California law, its ultimate protection on federal habeas

12    review arises from the federal due process clause.  *See Hayward*, 2010 WL 1664977, at *17.

13         To provide a framework for analyzing whether "some evidence" supported the

14    Governor's decisions with respect to petitioner, this Court must consider the California

15    statutes, regulations and case law which govern decision-making by the Board and by the

16    Governor.  *See Biggs v. Terhune*, 334 F.3d 910, 915 (9th Cir. 2003).  Under California law,

17    the Board is authorized to set release dates and grant parole for inmates with indeterminate

18    sentences.  *See* Cal. Penal Code § 3040 and 5075, *et seq.*  Section 3041(a) requires the Board

19    to meet with each inmate one year before the expiration of his minimum sentence and

20    normally set a release date in a manner that will provide uniform terms for offenses of similar

21    gravity and magnitude with respect to their threat to the public, as well as comply with

22    applicable sentencing rules.  Subsection (b) of this section requires that the Board set a release

01  date "unless it determines that the gravity of the current convicted offense or offenses, or the

02  timing and gravity of current or past convicted offense or offenses, is such that consideration

03  of the public safety requires a more lengthy period of incarceration for this individual, and

04  that a parole date, therefore, cannot be fixed at this meeting." *Id.*, § 3041(b).  Pursuant to the

05  mandate of § 3041(a), the Board must "establish criteria for the setting of parole release

06  dates" which take into account the number of victims of the offense as well as other factors in

07  mitigation or aggravation of the crime.  The Board has therefore promulgated regulations

08  setting forth the guidelines it must follow when determining parole suitability.  *See* 15 CCR

09  § 2402, *et seq.*

10       Accordingly, the Board is guided by the following regulations in making a

11  determination whether a prisoner is suitable for parole:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

REVISED REPORT AND RECOMMENDATION - 20

01   15 CCR § 2402(a) and (b).  Subsections (c) and (d) also set forth suitability and unsuitability

02   factors to further assist the Board in analyzing whether an inmate should be granted parole,

03   although "the importance attached to any circumstance or combination of circumstances in a

04   particular case is left to the judgment of the panel." 15 CCR § 2402(c).

05        Under the California Constitution, any parole decision made by the Board regarding

06   prisoners sentenced to indeterminate sentences based upon a conviction of murder is subject

07   to review by the Governor within thirty days.  *See* Cal. Const. Art. V § 8(b).  Although the

08   Governor may only affirm, modify, or reverse the Board's decision based upon the same

09   factors which the Board is required to consider, the Governor undertakes an independent, *de*

10   *novo* review of the inmate's suitability for parole.  *See Lawrence*, 44 Cal.4th at 1204.  If the

11   Governor decides to reverse or modify the Board's decision, he or she must "send a written

12   statement to the inmate specifying the reasons for his or her decision."  15 CCR § 3041.2(b).

13        In examining its own statutory and regulatory framework, the California Supreme

14   Court in *Lawrence* held that the proper inquiry for a court reviewing a parole decision by the

15   Board or Governor is "whether some evidence supports the *decision* of the Board or the

16   Governor that the inmate constitutes a current threat to public safety, and not merely whether

17   some evidence confirms the existence of certain factual findings."  *Lawrence*, 44 Cal.4th at

18   1212.  The court also asserted that a parole decision must demonstrate "an individualized

19   consideration" of the specified criteria, but "[i]t is not the existence or nonexistence of

20   suitability or unsuitability factors that forms the crux of the parole decision; *the significant*

21   *circumstance is how those factors interrelate to support a conclusion of current*

22   *dangerousness to the public."  Id*. at 1204-05, 1212 (emphasis added).  Although the

REVISED REPORT AND RECOMMENDATION - 21

01  discretion of the Board and the Governor in parole matters is very broad, they must offer

02  "more than rote recitation of the relevant factors with no reasoning establishing a rational

03  nexus between those factors and the necessary basis for the ultimate decision – the

04  determination of current dangerousness." *Id*.  Thus, the California penal code, corresponding

05  regulations, and decisional law clearly establish that the fundamental consideration in parole

06  decisions is public safety and an assessment of a prisoner's current dangerousness.  *See id.* at

07  1205-06.

08         B.    *Summary of Governing Principles*

09        By virtue of California law, petitioner has a constitutional liberty interest in release on

10  parole.  The parole authorities, in this case, the Governor, may decline to set a parole date

11  only upon a finding that petitioner's release would present an unreasonable current risk of

12  danger to society if he is released from prison.  Where the parole authorities deny release,

13  based upon an adverse finding on that issue, the role of a federal habeas court is narrowly

14  limited.  *See Hayward*, 2010 WL 1664977, at *10-11.  It must deny relief if there is "some

15  evidence" in the record to support the parole authority's finding of current dangerousness.

16  *See id.* at *11.  That is the determinative issue in this case.

17       VIII.   WAS THERE "SOME EVIDENCE" TO SUPPORT THE FINDING OF
              CURRENT DANGEROUSNESS?

18

19        Petitioner certainly *did, at one time*, pose an unreasonable risk of danger to society and

20  a threat to public safety.  The facts of the two murders, and his related activities, amply

    support that conclusion.  He readily admitted that, until 1989, he was "a very violent gang

21  member."  (Dkt. 6, Ex. 2 at 30.)  Even after his conviction and incarceration, for the first four

22  years or so, he continued his gang affiliation, and (in his words), "everything that I was doing

REVISED REPORT AND RECOMMENDATION - 22

01   on the streets I was still doing in prison. . . ." (*Id.*, Ex. 3 at 65.)

02       These facts, which lie at the heart of the Governor's reversals, would provide more

03   than ample support for his conclusions and would require this court to deny the petition; *but*

04   *only if this evidence is not vitiated by the passage of seventeen years and by evidence that*

05   *petitioner has radically changed in the meantime.*  It would not avail petitioner – at least not

06   in a federal habeas court – if his remarkable progress in the past seventeen years can only be

07   *weighed against* the violence in his past.  The federal habeas court is not permitted to second-

08   guess the Governor's weighing of suitability evidence against evidence of unsuitability.  If

09   petitioner's violent past remained probative of his current dangerousness, as clarified by

10   *Lawrence*, then the Governor could properly consider it, and this habeas petition must be

11   denied.

12       The issue of what evidence remains probative of current dangerousness in a California

13   parole hearing is governed by California law.  The California Supreme Court recently

14   addressed this issue at length in *Lawrence*.  This 2008 decision was filed after all of the

15   relevant decisions in this case: the two reversals by the Governor, and the state court denials

16   of habeas relief.  In *Lawrence*, the majority held:

17   > In sum, the Board or the Governor may base a denial-of-parole

18   > decision upon the circumstances of the offense, or upon other
> immutable facts such as the inmate's criminal history, but some
> evidence will support such reliance *only* if those facts support

19   > the ultimate conclusion that an inmate *continues* to pose an
> unreasonable risk to public safety.  (Regs., §2281, subd. (a)).

20   > Accordingly, the relevant inquiry for a reviewing court is not
> merely whether an inmate's crime was especially callous, or

21   > shockingly vicious or lethal, but whether the identified facts are
> *probative* to the central issue of *current* dangerousness when

22   > considered in light of the full record before the Board or the
> Governor.

REVISED REPORT AND RECOMMENDATION - 23

01  *Lawrence*, 44 Cal.4th at 1221.

02      Applying that rule, the court in *Lawrence* held, "Accordingly, even as we

03  acknowledge that some evidence in the record supports the Governor's conclusion regarding

04  the gravity of the commitment offense, we conclude that there does not exist some evidence

05  supporting the conclusion that petitioner *continues* to pose a threat to public safety." *Id*. at

06  1225.

07      In the present case, the record overwhelmingly establishes that all of the negative

08  conduct upon which the Governor relied was directly related to petitioner's active

09  participation in a gang. His gang involvement lay at the foundation of the murders, and of his

10  misconduct during his first four years in prison. The record is also overwhelming and

11  uncontradicted that petitioner terminated all involvement with gangs in 1989. In fact, his

12  refusal to do what he was directed to do as a gang member (i.e., stab another person) put his

13  own life at risk in 1992. Through his years of participation in the CGA program within the

14  institution, he has worked to assist others to understand why they became involved in gangs,

15  and why it is crucial that they withdraw. He has also committed to continue this work with

16  others after his release, even in Mexico.

17      In *Lawrence*, the California Supreme Court recognized that "the possibility of parole

18  acts as an incentive – encouraging good behavior and discouraging misconduct by confined

19  prisoners. Failure to consider a prisoner's postconviction behavior when evaluating

20  suitability for parole would undermine the practical institutional benefits of this regulatory

21  incentive." *Id*. at 1220, n.19. The court added: "[t]he Legislature considered the passage of

22  time - and the attendant changes in a prisoner's maturity, understanding, and mental state - to

01  be highly probative to the determination of current dangerousness."  *Id*. at 1219-20.

02        The manifest change in petitioner's outlook, and in his behavior, severs the probative

03  link between his past gang-related conduct and any determination of his dangerousness, as of

04  2006.  For the reasons set forth in *Lawrence*, the circumstances of petitioner's commitment

05  offenses, and his conduct during his first four yours in prison, did not constitute "some

06  evidence" of his dangerousness in 2006.

07        In denying release, the Governor also noted the Los Angeles County District

08  Attorney's opposition.  (*See* Dkt. 6, Ex. 4 at 3; *id*., Ex. 5 at 2.)  During petitioner's 2005

09  Board hearing, the district attorney argued that his office's opposition was based entirely upon

10  petitioner's "life crime and the other crime."  (*Id*., Ex. 2 at 76.)  Specifically, the district

11  attorney urged the Board to "keep in mind the degree of violence, the fact that we have

12  multiple victims and [petitioner's] role in these crimes that were carried on over a period of

13  time."  (*Id*. at 78.)  Even while opposing petitioner's release, however, the district attorney

14  admitted, "I would again indicate that I believe [petitioner has] made as much progress as any

15  inmate I've seen since I've been doing these parole hearings.  Both in terms of advancing

16  educationally, doing the self-help and also setting up very solid parole and probation plans."

17  (*Id*.)

18        During the 2006 Board hearing, the Los Angeles District Attorney again argued that

19  petitioner should be found unsuitable for parole, and based his recommendation upon

20  petitioner's commitment offense, prior criminal record, and disciplinary violations in prison.

21  (*See id*., Ex. 3 at 88-95.)  Despite his recommendation, the district attorney admitted to the

22  panel that petitioner was "as impressive an individual as I have seen in terms of evidencing a

REVISED REPORT AND RECOMMENDATION - 25

01  changed attitude by an admitted hard core gang member. . . ." (*See id*. at 88.)  He also

02  observed that petitioner demonstrates "remarkable insight," and stated he believes petitioner's

03  statements to the panel were "sincere."  (*See id*.)

04      In making a suitability determination, the Board and Governor must "take into account

05  all pertinent information and input about the particular case from the inmate's victims, the

06  officials familiar with his or her criminal background, and other members of the public who

07  have an interest in the grant or denial of parole to this prisoner."  *In re Dannenberg*, 34

08  Cal.4th 1061, 1086 (2005).  California law provides that a prosecutor may attend a parole

09  hearing to represent "the interests of the people," and may "comment on the facts of the case

10  and present an opinion about the appropriate disposition."  *See* Cal. Penal Code § 3041.7; 15

11  CCR § 2030.  Thus, the Governor's consideration of the district attorney's statements was

12  appropriate, and was not arbitrary and capricious.

13      In the absence of other reliable evidence of unsuitability in the record, however,

14  opposition by law enforcement based upon the nature of the commitment offense does not

15  constitute "some evidence" to support parole denial.  *See Rosenkrantz v. Marshall*, 444 F.

16  Supp. 2d 1063, 1080 n.14 (C.D. Cal. 2006) (holding that "some evidence" did not support the

17  Board's denial of parole where it "simply noted the opposition" by the district attorney, and

18  such opposition was "merely cumulative" of the Board's own determination).  With

19  petitioner's conduct up until 1989 eliminated from consideration, the opposition by the district

20  attorney stands alone.  Without more, the district attorney's opposition to petitioner's release

21  on parole does not constitute "some evidence" that petitioner would have posed an

22  unreasonable risk of danger to society if released on parole.

01          IX.     LOS ANGELES COUNTY SUPERIOR COURT DECISION

02          As discussed in Part VI *supra*, "[u]nder the 'unreasonable application' clause, a

03   federal habeas court may grant the writ if the state court identifies the correct governing legal

04   principle from [the U.S. Supreme] Court's decisions but unreasonably applies that principle to

05   the facts of the prisoner's case." *Williams*, 529 U.S. at 413.   For the reasons discussed above,

06   this Court finds that the Los Angeles County Superior Court's decision unreasonably applied

07   the due process principles set forth in *Greenholtz* and *Allen* to petitioner's case.  *See*

08   *Greenholtz*, 442 U.S. at 7, 12; *Allen*, 482 U.S. at 377-78.  *See also Hayward*, 2010 WL

09   1664977, *17.  Specifically, although the superior court correctly recognized the "some

10   evidence" standard from California decisional law, it did not foresee the holding of *Lawrence*,

11   that under the facts of this case, the conduct of Hernandez through 1989 was no longer

12   probative of his current dangerousness.  *Lawrence* requires the conclusion that there was not

13   "some evidence" to support the Governor's finding of petitioner's current dangerousness in

14   2006.

15          Finally, it is important to note that petitioner's case differs in crucial respects from the

16   factual scenario in *Hayward*.  Hayward was sentenced in 1980 to fifteen-years-to-life for

17   murder.  *See id*. at *1.  During Hayward's first fifteen years in prison, he "denied

18   responsibility and disparaged the victim," and even after admitting his crime, he "told a

19   psychological evaluator that he felt good about killing [his victim]."  *Id*. at *2.  Although

20   Hayward remained discipline free for the last fifteen years of his incarceration, his most

21   recent psychological evaluation still assessed his risk of future violence in the community as

22   "low to moderate."  *Id*. at *18.  The Governor denied parole based upon Hayward's heinous

01     crime, extensive history of violence and criminal activity, "moderately favorable" mental

02     health evaluation, continued involvement with drugs and white-racist gangs during at least

03     nine years of his incarceration, and concern regarding the sincerity of his remorse. *Id*. at *1-3,

04     18. As a result, the Ninth Circuit found that the state courts had not unreasonably determined

05     that there was "some evidence" of current dangerousness to support the Governor's 2003

06     parole denial. *See id.* at *11.

07         In contrast, the record in petitioner's case overwhelmingly establishes that *all* of the

08     negative conduct upon which the Governor relied, including petitioner's criminal activity and

09     misconduct in prison, ended as soon as petitioner terminated his gang affiliation after four

10     years of incarceration. The sincerity of petitioner's remorse is undisputed, and his most

11     recent psychological evaluation assessed his future risk of violence as "minimal." (*See* Dkt.

12     6, Ex. 2 at 22; *id*., Ex. 3 at 65-66, 114-15.) As the Ninth Circuit acknowledged in *Hayward*,

13     "to focus completely on unchanging factors [to deny parole] . . . is at odds with a parole

14     system that assumes, as its basic premise, that some rehabilitation is at least possible."

15     *Hayward*, 2010 WL 1664977, at *18 (citing *Lawrence*, 44 Cal.4th at 1219-20.)

16     Accordingly, although the California courts reasonably applied California's "some evidence"

17     requirement in upholding the Governor's parole denial in *Hayward*, it was unreasonable to do

18     so in this case. There is no evidence in the record before this Court that petitioner remains

19     currently dangerous.

20         X.     "CONVERSION OF SENTENCE" CLAIM

21         Petitioner's remaining argument is that the Governor's parole denials have "converted

22     [petitioner's] 15 years to life sentence into a sentence of life without any possibility of parole,

01   which is clearly a prohibited result in light of the California parole statutes and current state

02   and federal case law regarding release on parole." (Dkt. 1 at 6.)  In support of his contention,

03   petitioner cites two decisions by the California Court of Appeal and § 2402(a) of title 15 of

04   the California Code of Regulations.  (*See id.*)

05          Even construed liberally, the federal constitutional basis of petitioner's claim in this

06   respect is unclear.  In this Circuit, petitioners must "make the federal basis of the claim

07   explicit either by specifying particular provisions of the federal Constitution or statutes, or by

08   citing to federal case law."  *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005)

09   (citing *Lyons v. Crawford*, 232 F.3d 666, 668, 670 (9th Cir. 2000), *as modified by* 247 F.3d

10   904 (9th Cir. 2001)).  According, petitioner's argument is unavailing.

11          XI.     CONCLUSION

12          For the reasons stated above, this Court finds that there was no evidence that as of

13   June 9, 2006, the date of the Governor's 2006 parole decision, petitioner would have posed an

14   unreasonable risk of danger to society or threat to public safety if released from prison.

15   Accordingly, petitioner's federal due process rights were violated, and the California Supreme

16   Court's April 16, 2007, decision upholding the Governor's parole denial was an unreasonable

17   application of clearly established federal law.  It is therefore recommended that the District

18   Court issue an order (1) approving and adopting this Revised Report and Recommendation;

19   (2) directing that Judgment be entered granting a writ of habeas corpus; and (3) directing the

20   Board, within thirty days after the Judgment in this case becomes final, to set a date on which

21   petitioner shall be released from prison and begin his period of parole supervision.

22

01        The undersigned previously recommended that in calculating petitioner's period of

02   parole supervision, the Board should give petitioner credit against his parole term for time

03   spent in prison when he would not have been incarcerated, but for the Governor's decision in

04   2006.  This remedy no longer appears to be available to petitioner, however.[5]  While the Court

05   would prefer, if possible, to afford petitioner a remedy for the time he spent unconstitutionally

06   incarcerated, in light of the California state and district court decisions addressing this issue,

07   no other remedy appears available.[6]

08        This Revised Report and Recommendation is submitted to the United States District

09   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within

10   fourteen (14) days of being served with this Revised Report and Recommendation, any party

11   may file written objections with this Court and serve a copy on all parties.  Such a document

12   should be captioned "Objections to Magistrate Judge's Revised Report and

13

14        [5] Specifically, petitioner appears to be subject to a lifetime period of parole under California Penal
     Code § 3000.1, because his second degree murder offenses were committed after the statute's enactment on
15   January 1, 1983.  *See* Cal. Penal Code § 3000.1(a).  A prisoner's lifetime parole period may only be discharged if
     the prisoner "has been released on parole from the state prison, and has been on parole continuously for . . . five
16   years . . . since release from confinement. . . ."  *Id.* § 3000.1(b).  In addition, the California Court of Appeal
     recently held that the plain language of this statute "explicitly precludes the application of any time spent *in
     custody prior to release* to satisfy any part of section 3000.1's five-year parole discharge eligibility
17   requirement," even where the prisoner has been unconstitutionally incarcerated as the result of an adverse parole
     decision.  *In re Chaudhary*, 172 Cal.App.4th 32, 37 (2009).  Although the *Chaudhary* decision is not binding in
     this context, this Court is mindful that federal habeas courts should generally defer to state court interpretations
18   of state law.  *See Estelle*, 502 U.S. at 67; *Murtishaw*, 255 F.3d at 964.
          [6] *Compare Rios v. Mendoza-Powers*, 2010 WL 1032696 (E.D. Cal. 2010) (holding that although
19   prisoners with fixed parole periods may be "credited" for time spent unconstitutionally incarcerated, under
     *Chaudhary*, similar "credits" cannot be provided to prisoners with lifetime parole periods), *with McQuillon v.
20   Duncan*, 342 F.3d 1012 (9th Cir. 2003) (where petitioner's fixed three-year parole period would have lapsed but
     for constitutional violation, appropriate remedy was immediate release without parole supervision), *and Walker
21   v. Cate*, 2010 WL 1444524 (E.D. Cal. 2010) (prisoner whose crime was committed prior to the enactment of Cal.
     Penal Code § 3000.1 could receive "credit" against his fixed five-year parole period for the time he spent
     unconstitutionally incarcerated), *and Thomas v. Yates*, 637 F. Supp. 2d 837, 841 (E.D. Cal. 2009) (same).  *But
22   see Thompson v. Carey*, 2009 WL 1212202 (E.D. Cal. 2009) (declining to apply Cal. Penal Code § 3000.1 in the
     manner suggested by the *Chaudhary* court because it "would leave those prisoners [with lifetime parole periods]
     without any effective remedy for their unconstitutional confinement.").

REVISED REPORT AND RECOMMENDATION - 30

01    Recommendation."  Either party may then respond to the other party's objections within

02    fourteen (14) days of being served a copy of such written objections.  Failure to file objections

03    within the specified time may waive the right to appeal the District Court's order.  *Martinez v.*

04    *Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A proposed order accompanies this Revised Report and

05    Recommendation.

06              DATED this 17th day of May, 2010.

07

08

09                                                          JOHN L. WEINBERG
                                                            United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

REVISED REPORT AND RECOMMENDATION - 31